**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PAMELA HENDERSON, | : | Civil Action |
| | : | |
| Plaintiff, | : | No. 09-CV-4866 |
| | : | |
| v. | : | |
| | : | |
| DELAWARE COUNTY PARK POLICE and | : | Jury Trial Demanded |
| DELAWARE COUNTY, et al., | : | |
| | : | |
| Defendants. | : | |

**ORDER**

AND  NOW, _____ day  of _____, 2010,  upon
consideration  of  the  Motion  for  Summary  Judgment  filed  by
Defendants Delaware County Park Police and Delaware County, and
any appropriate responses thereto, it is ORDERED that said Motion
is GRANTED.   Judgment is entered in favor of Defendants and the
Clerk of Court is directed to list this case as CLOSED.

By the Court:

_____
L. FELIPE RESTREPO,
United States Magistrate Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PAMELA HENDERSON, | : | Civil Action |
| | : | |
| Plaintiff, | : | No. 09-CV-4866 |
| | : | |
| v. | : | |
| | : | |
| DELAWARE COUNTY PARK POLICE and | : | Jury Trial Demanded |
| DELAWARE COUNTY, et al., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS', DELAWARE COUNTY PARK POLICE,
AND DELAWARE COUNTY
MOTION FOR SUMMARY JUDGMENT**

Defendants Delaware County Park Police and Delaware County, by and through their attorneys, HOLSTEN & ASSOCIATES, hereby file this Motion for Summary Judgment, and in support thereof state as follows:

1.  A Complaint was filed on October 22, 2009.  A true and correct copy of the Complaint is attached as Exhibit A.  The Complaint identified Pamela Henderson as Plaintiff and named Delaware County Park Police Department and Delaware County as defendants, but consisted entirely of allegations involving consumer fraud that involved neither Henderson nor Delaware County Park Police or Delaware County.  A true and correct copy of the Complaint is attached as Exhibit A.

2.  On October 29, 2009, Plaintiff filed an Amended Complaint. The Amended Complaint included 2 claims under 42 U.S.C. § 1983, one for excessive force and another based on Monell liability, a claim under the Americans With Disabilities act, a punitive damages claim and a state law claim for assault and battery.  Damages are alleged to

be excess of \$75,000, with punitive damages in excess of \$250,000. A true and correct copy of the Amended Complaint is attached as Exhibit B.

3. For reasons set forth more fully in the accompanying Memorandum of Law, Defendants are entitled to summary judgment.

4. Defendant Delaware County Park Police is entitled to summary judgment the Delaware County Park Police is not a "person" for the purposes of Section 1983.

5. Defendant Delaware County is entitled to summary judgment because there no evidence supporting a Monell "policy or practice" claim.

6. Defendants are entitled to summary judgment because even if Plaintiff had amended the complaint to include the officers involved, the alleged use of force—which consists entirely of an allegation that an officer "grabbed" Plaintiff's arm during a routine search at a metal detector in the lobby of the Delaware County Courthouse—was a "de minimis" use of force and therefore cannot be considered excessive force under the Fourth Amendment.

7. Defendants are entitled to summary judgment because, even if Plaintiff had amended the complaint to include the officers involved, they are protected by qualified immunity.

8. Defendants are entitled to summary judgment because Plaintiff has failed to amend the complaint to specifically identify the "john does" named as defendants, nor served the officers involved within 120 days of the filing of the original Complaint, as required by Rule 4.

2

9.     Defendants are entitled to summary judgment because there is no evidence to support Plaintiff's claim under the Americans with Disabilities Act.

10.     Defendants are entitled to summary judgment on Count IV of the Amended Complaint because punitive damages cannot be assessed against a municipality nor can they be collected against john doe defendants.

11.     Defendants are entitled to summary judgment because there is no evidence to support a state law claim of assault and battery.

**WHEREFORE**, Defendants Delaware County Park Police and Delaware County respectfully request that this Honorable Court grant their Motion for Summary Judgment and enter the attached form of Order.

Respectfully submitted,

**HOLSTEN & ASSOCIATES**

By:     */s/ M.A. RAITH, MR6959*
**MARK ALAN RAITH, ESQUIRE**
Holsten & Associates
1 S. Olive Street
Media, PA 19063
(610) 566-8800
Attorney for Defendants
Delaware County Park Police and
Delaware County

Dated: September 17, 2010

3

# EXHIBIT "A"

**MSG**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Pamela Henderson<br>504 South Lansdowne Avenue, Apt. A7<br>Yeadon, PA 19050 | : | |
| | : | |
| | : | |
| Plaintiff, | : | DOCKET NO.: |
| v. | : | **09    4866** |
| | : | |
| Delaware County Park Police Department<br>201W. Front Street<br>Media, PA 19063 | : | |
| | : | |
| and | : | |
| | : | |
| Delaware County<br>201W. Front Street<br>Media, PA 19063 | : | |
| | : | |
| and | : | |
| | : | |
| John Does 1-10 | : | JURY TRIAL OF TWELVE (12)<br>JURORS DEMANDED |
| Defendants. | : | |

## CIVIL ACTION COMPLAINT

### I. Jurisdiction

1.     Plaintiff brings this case under federal, state, and constitutional laws and amendments,

respectively.

2.     Plaintiff seeks actual, statutory and punitive damages together with attorney's fees and

costs, and injunctive relief.

3.     Jurisdiction of this matter is conferred upon this Court by 28 U.S.C. §1331; supplemental

jurisdiction over Plaintiff's state law claims granted by 28 U.S.C. §1367.

4.     Venue lies in this judicial district in that the events that gave rise to this claim occurred

here, and one of the Defendants do business here.

2.      Plaintiff seeks actual, statutory and punitive damages together with attorney's fees and costs, and injunctive relief.

3.      Venue lies in this judicial district in that the events that gave rise to this claim occurred here, and one of the Defendants do business here.

**II. Parties**

4.      Plaintiff, Jeffrey Tiller, is an individual at all times residing at the above-captioned address.

5.      Defendant, Car Sales, Inc., is a corporation duly organized in the Commonwealth of Virginia and maintaining a principal place of business at the above-captioned address.

6.      Defendant, Chester Pike Auto Sales, Inc. ("Dealership"), is a corporation duly organized in the Commonwealth of Pennsylvania and maintaining a principal place of business at the above-captioned address.

7.      Defendant, Lease and Rental Management Corp, doing business as Penn Auto Loan ("Lender"), is a corporation duly organized in the State of Massachusetts and maintaining a principal place of business at the above-captioned address.

**III. Operative Facts**

8.      A few or so days prior to April 23, 2009, Plaintiff was handed a flier ("flier") by a believed agent, servant, workman or employee of Defendant, Car Sales, Inc. (Exh. A).

9.      The flier states, *inter alia*, "100% approval... I can get you what you want, with what you have!...no one refused!..100% approval! Repo yesterday...Mr. D will get you done today! Guaranteed! Everyone drives! Bring them all! They are approved! Prior repossession? Okay!!! You are driving regardless of credit..." Id.

10.     That day, Plaintiff called the number, 267-975-8894 believed to be a cell phone, indicated

on the flier and spoke to Defendant, John Doe, an individual advising Plaintiff that his name was

Mr. D, believed to be named Denny an agent, servant, workman or employee of Car Sales.

11.     In response to the flier, Plaintiff advised Mr. D that Plaintiff was interested in obtaining

financing towards Plaintiff's purchase of a vehicle.

12.     Plaintiff advised Mr. D that Plaintiff's credit was marred by a prior repossession believed

through a lender now known as Penn Auto arising from Plaintiff's non-payment towards a 1999

Ford Taurus purchased in 2004 which non-payment and thus repossession was caused by

Plaintiff's prior, temporary employment.

13.     Since that repossession, Plaintiff has been, and was at the time of the circumstances here

giving rise, and is still full-time employed as a customer services representative for Comcast

(non-party).

14.     Mr. D advised Plaintiff that Car Sales would still get Plaintiff approved for financing

towards the purchase of a new vehicle regardless of that prior voluntary repossession.

15.     Mr. D advised that Mr. D would pick up Plaintiff to pick out what was to become

Plaintiff's new vehicle for which Mr. D reassured Plaintiff that Car Sales would be able to obtain

the necessary financing.

16.     At no time was the relationship between Car Sales and Dealership explained to Plaintiff.

17.     Mr. D advised Plaintiff that Plaintiff would need to bring pay-stubs, prior year's tax

return, a driver's license, and a $1,000.00 deposit.

18.     Mr. D picked up Plaintiff at Plaintiff's friend's house taking him to Defendant, Chester

Pike Auto Sales.

19.     On April 23, 2009, Plaintiff was dropped off at Dealership by Mr. D.

20.     At Dealership, Plaintiff with the assistance of Dealership's representative salesman,
Defendant, John Doe, believed to be named Jon Kohn, looked at some cars towards Plaintiff's
prospective purchase.

21.     After seeing and test-driving the 2006 Pontiac G6 Plaintiff advised Jon that Plaintiff
loved the car and wanted to purchase it via financing.

22.     Unfortunately, Plaintiff advised, Plaintiff had brought his deposit ($1,000.00), pay-stubs
and prior year's tax return, but had forgotten his driver's license.

23.     Nonetheless, Plaintiff advised Jon that Plaintiff wanted to complete all paperwork so that
the car would become titled, financed and otherwise paid for so that Plaintiff could merely return
to dealership to retrieve what was to be then Plaintiff's new car.

24.     Jon agreed and Plaintiff and Jon mutually executed a motor vehicle Retail Installment
Contract ("RISC") (Exh. B), a registration (Exh. C), and buyer's order identifying the total sales
price at $14,300.10 (Exh. D), among other paperwork (Exh. E).

25.     The RISC identifies Plaintiff's creditor as Dealership.

26.     The RISC states the total sale price as $19,373.60, indicating an amount financed of
$12,360.00 with annual percentage rate ("APR") of 21%.

27.     Plaintiff left the Dealership believing that he had purchased his vehicle and all that was
required of Plaintiff was to return with his driver's license.

28.     Plaintiff returned to the Dealership with his license and left, seemingly with his new
vehicle, believing the sale had been finalized.

29.     Thereafter, Plaintiff received a telephone call from Defendant, John Doe, a representative
of Defendant, Penn Auto, requesting income and employment verification from Plaintiff towards
Penn Auto's financing, which Plaintiff complied.

30.     About one (1) week or so after April 23, 2009, Plaintiff contacted dealership due to the fact that the vehicle lacked inspection and contained water stains on the windshield.

31.     By that time, Plaintiff's down payment had been negotiated as had his separate payment for taxes and tags aggregate.

32.     In response to Plaintiff's telephone call regarding inspection and windshield repair, Dealership, through Defendant, John Doe, requested Plaintiff return to the Dealership with the vehicle so that it could be inspected and repaired.

33.     When Plaintiff bought his vehicle back, believed to be on a Monday, for inspection, the vehicle received inspection stickers but Plaintiff was advised by Dealership's representative that Plaintiff would need to return to get his vehicle's windshield repaired at another date when Dealership's window repairman was on site.

34.     Plaintiff, again, left Dealership with the vehicle, without any issues from Dealership.

35.     Just prior to Plaintiff returning to Dealership with the vehicle for the windshield's repair, another salesman, Defendant, John Doe, from dealership directed Plaintiff to return his vehicle as financing by Penn Auto was not approved.

36.     ‑ Representative advised that Plaintiff's financing was not approved due to the prior repossession that was found on Plaintiff's credit report.

37.     Plaintiff was bewildered as Plaintiff had advised Mr. D and Jon about Plaintiff's prior repossession.

38.     Plaintiff inquired as to how the vehicle could be released to him, inspected, deposit negotiated, and draft towards taxes and tags negotiated but not approved for financing.

39.     Representative refused to answer Plaintiff's questions and only advised Plaintiff that
Plaintiff needed to return the vehicle and threatened Plaintiff with another repossession if
Plaintiff did not return the vehicle.

40.     In response, Plaintiff contacted Mr. D who did not return the Plaintiff's call.

41.     Plaintiff returned the vehicle.

42.     After Plaintiff's vehicle's return to dealership, Defendant, Mr. D contacted Plaintiff to
advise Plaintiff that Mr. D would be able to obtain financing for Plaintiff through another
dealership.

43.     Just as before, Mr. D picked up Plaintiff.

44.     Plaintiff told Mr. D about the entire situation, described above.

45.     Mr. D responded by advising Plaintiff that Mr. D could not believe Dealership did this to
Plaintiff especially because Plaintiff had previously advised both Mr. D who had advised
Dealership of Plaintiff's derogatory credit, as did Plaintiff to Dealership directly, and Dealership
likewise confirmed that derogatory credit when Dealership had obtained Plaintiff's credit
information prior to the execution of the paperwork.

46.     Plaintiff reiterated that Dealership had advised Plaintiff that Plaintiff's financing was
rejected because the prior repossession was also with Penn Auto the current creditor of the
financing of Plaintiff's new vehicle.

47.     In response, Mr. D apologized for himself and Dealership repeating that Mr. D did not
believe or understand what had occurred.

48.     Plaintiff later discovered through review of the RISC that Dealership had, in fact,
financed Plaintiff directly but, upon information and belief, Dealership represented otherwise in

advising Plaintiff to return the vehicle for rejected financing because Dealership could not sell its loan to Penn Auto to Dealership's profit.

49.     When Dealership advised Plaintiff that he was rejected for financing, Dealership misrepresented that Dealership had approved Plaintiff for financing.

50.     Rather, Dealership's sale of Plaintiff's loan was rejected by Penn Auto forcing Dealership to retain creditor status thus motivating Dealership to, for the above misrepresentations, undo the transaction.

51.     As creditor, Dealership approved Plaintiff for financing but then unlawfully rescinded financing without notice to Plaintiff.

52.     Likewise, upon information and belief, Penn Auto contacted Plaintiff not to approve Plaintiff's financing as Penn Auto had represented but, in fact, to verify Penn Auto's purchase of Dealership's note as profitable to Penn Auto.

53.     Penn Auto did not send notice that Plaintiff's financing was rejected.

54.     Plaintiff granted strictly one (1) authorization of Dealership's credit inquiry towards financing but now believes Dealership *and* Penn Auto, both, ran Plaintiff's credit without permission and outside of the scope of Plaintiff's prior authorization, respectively.

55.     Car Sales through Mr. D and its flier represented to Plaintiff that Plaintiff was guaranteed financing approval and vehicle purchase, which was not true.

56.     Dealership represented to Plaintiff that Dealership was not Plaintiff's creditor, when that was not true.

57.     Dealership represented to Plaintiff that Dealership was unable to obtain Plaintiff vehicle financing, which was not true.

58.     Dealership represented to Plaintiff that Plaintiff was obligated to return the vehicle to dealership for failure of Dealership to obtain Plaintiff financing, when that was not true.

59.     At all times, Plaintiff believed and acted in accordance with Defendants' representation upon which Plaintiff justifiably relied resulting in Plaintiff essentially undergoing a voluntary repossession to his detriment and damage including the loss of the vehicle and Plaintiff's down payment

60.     The foregoing unauthorized credit inquiries and Penn Auto's rejection caused Plaintiff credit impairment.

61.     The sale and then demand for return of the vehicle constitutes an unlawful repossession to the loss of Plaintiff's vehicle as well as credit impairment.

62.     Upon information and belief, Car Sales and Dealership are inter-related companies that make representations for each other.

63.     Upon information and belief, Car Sales and Dealership have a on-going relationship, that began prior to Plaintiff's contact, wherein Car Sales receives a portion of the profits from when Dealership sells the financing agreements for a profit.

64.     Defendants never expressed in any manner any allegation that Plaintiff supplied any false or unverifiable information in connection with the transaction.

65.     Defendants never expressed in any manner any allegation that Defendants' actions as set forth herein were taken as a result of any false or unverifiable information supplied by Plaintiff.

66.     Defendants never expressed in any manner any allegation that Plaintiff was to blame for any of Defendants' actions.

67.     Plaintiff has no experience in or specialized knowledge related to the automotive industry, and/or related to motor vehicles, motor vehicle sales, and/or consumer finance.

68.     Defendants stood in a position of trust and confidence.

69.     By virtue of their position of trust and confidence, their unequal sophistication and expertise, Defendants had the means to take advantage and exercise undue influence over Plaintiff.

70.     Defendants stood in a fiduciary relationship with Plaintiff.

71.     Defendants exploited their fiduciary relationship by deceiving Plaintiff regarding the party's respective rights and duties under the RISC and concealing the natures of Defendants' conduct.

72.     The established business practices discussed in the preceding paragraphs caused Plaintiff to misunderstand how Defendants were treating the RISC, caused Plaintiff to return the vehicle, caused Plaintiff to suffer, by his dealings with Defendant, annoyance, embarrassment, fear, and other general distress damamges, and caused Plaintiff to be denied the benefits of the consumer protection statutes specifically designed to protect him.

73.     Defendants are in the business and regularly extend credit to consumers in the manner described above.

74.     The subject vehicle was purchased by Plaintiff primarily for personal use.

75.     Defendants induced and entered into the subject purchase-sale agreements with a then present and conscious intent to breach, reject, and/or refuse to honor their obligations under said agreement, if they could not sell the RISC at terms satisfactory to them.

76.     The established business practices discussed in the preceding paragraphs were created, implemented, approved, and/or supervised by Defendants.

77.     As a result of Defendants' unlawful actions, Plaintiff has been deprived the use of the vehicle, has incurred expenses for replacement transportation, has suffered damage to his credit

rating and credit reputation, and has suffered extreme emotional distress, frustration, humiliation, and embarrassment.

78.     The established business practices described above and below were part of a systematic business practice called "spot delivery" or "yo-yo delivery" intended to secure for Defendants unearned dealer profits.

79.     The established "spot delivery" or "yo-yo delivery" practices described above and below are unlawful, deceptive, misleading, and fraudulent.

80.     The established "spot delivery" or "yo-yo delivery" practices described above and below commenced prior to the execution of any agreement, were designed and intended to induce Plaintiff to enter into an agreement, and persisted after the apparent agreement was consummated.

81.     During all times relevant, Defendants deceived Plaintiff into believing Defendants' actions were lawful, and/or concealed their actions' unlawful nature.

82.     At all times relevant, Plaintiff relied on Defendants' apparent and claimed experience, sophistication and expertise in inspecting, selling, and/or financing motor vehicles.

## COUNT I
## ECOA

83.     Plaintiff incorporates paragraphs 1-82 as if same were fully set forth at length herein.

84.     Plaintiff is an "applicant" as the term is defined by 15 U.S.C. §1691(a)(b)

85.     Defendants are "creditors" term is defined by 15 U.S.C. §1691(a)(e)

86.     Plaintiff completed a credit application and/or one was completed on his behalf, applied to Defendants for credit in connection with his purchase of the subject vehicle from Defendants.

87.     Under the provision of ECOA, Defendants were required to give notice of their decision on that credit application to Plaintiff within 30 days of receipt.

88.     Defendants verbally informed Plaintiff that he had been approved for credit in the transaction to purchase the subject vehicle.

89.     At the time that Defendants informed Plaintiff that he had been approved for credit, Defendants knew or had reason to now that Defendants would not actually extend credit to Plaintiff for the vehicle and knew or should have known that the installment contract could not be assigned on terms that would have been acceptable to Plaintiff.

90.     Defendants later informed Plaintiff that he did not qualify for credit to purchase the subject vehicle, and credit was denied, effectively termination the transaction.

91.     The original notice of approval given to Plaintiff was false, and, in general, a violation of the provision of 15 U.S.C. §1691(d).

92.     The false credit approval was used as the "bait" which was designed to defraud Plaintiff into purchasing the vehicle on terms which were less advantageous to Plaintiff.

93.     The subsequent denial, the revocation of credit, and the vehicle repossession by Defendants constituted an "adverse action" as the phrase is defined by 15 U.S.C. §1691(d).

94.     After taking adverse action of Plaintiff's credit application for the subject vehicle, Defendants were required to provide written notice of that adverse action within 30 days, 15 U.S.C. §1692(a).

95.     Defendants failed or refused to provide that written notice to Plaintiff, in violation of ECOA.

96.     Defendants were required to maintain such records or other data relating to such loans as may be necessary to evidence compliance with ECOA or to enforce any action pursuant to the authority under the act.

97.    Upon information and belief, Defendants failed or refused to maintain records of that

transaction which would fulfill to provisions of ECOA.

## COUNT II
## UTPCPL

98.    Plaintiff incorporates paragraphs 1-97 as if same were fully set forth at length herein.

99.    Prior to the execution of the RISC, Defendants' agents, made the following

representations about the vehicle and the transaction:

      a.    financing had been approved;

      b.    the purchase and financing were final and complete upon Plaintiff signing the
          RISC and producing his license;

      c.    all charges were lawful;

      d.    Defendants were transferring title and registration lawfully.

100.   Prior to the execution of the RISC, Defendants' agents, concealed from Plaintiff the

following facts:

      a.    Defendants would deny that financing was approved;

      b.    Defendants would deny that the deal was final and binding upon Plaintiff signing
          the RISC.

101.   The misrepresentations and omissions identified in the preceding paragraphs were known

or should have been known to Defendants to be false when made, were material in nature, and

were made with the intent to deceive, defraud and/or induce Plaintiff, and in fact, induce him to

purchase the automobile at the price listed in the RISC.

102.   Defendants knew that Plaintiff had no special knowledge in the purchase and financing of

automobiles and would rely on their representations.

103.    Plaintiff relied on Defendants" misrepresentations and were induced to sign the RISC and other documents related to the sale which Defendants apparently and ostensibly purchased and financed the vehicle.

104.    As a result of the aforementioned conduct, Plaintiff suffered the damages outlined above and below, including but not limited to:

    a.    increase purchase costs;

    b.    damaged credit rating and reputation;

    c.    deprived of the use and enjoyment of the vehicle;

    d.    incurred cost of replacement vehicle;

    e.    spent time resolving problems created by Defendants' breach;

    f.    incurred other incidental and consequential damages.

105    Defendants' actions were reckless, outrageous, willful, and wanton, thereby justifying the imposition of exemplary, treble and/or punitive damages.

106    As described, the actions of Defendants constitute unfair or deceptive acts and practices under the Unfair Trade Practices and Consumer Protection Law (UTPCPL) 73 Pa.C.S.A. §201-1, et seq., including but not limited to the violation of 73 P.S. §201-2(4):

    ii.    Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

    v.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

    ix.    Advertising goods or services with intent not to sell them as advertised;

    xi    Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

    xxi.    Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

## COUNT II
### Pennsylvania Motor Vehicle Sales Finance Act

107     Dealership is licensed pursuant to 69 P.S. §604.

108     Pursuant to 69 P.S. § 610 Dealership's license may be revoked if it has violated any

provision of the MVSFA.

109.    Pursuant to 69 P.S. §§ 610 and 612, Dealership must maintain satisfactory records to

determine that the business is being operated in accordance with the MVSFA and may not falsify

any records.

110     Dealership violated MVSFA by defrauding Plaintiff.

111.    Dealership violated MVSFA by failing willfully to perform a written agreement with

Plaintiff.

112.    Dealership violated MVSFA by engaging in unfair, deceptive, fraudulent or illegal

practices or conduct in connection with any business regulated under the MVSFA.

WHEREFORE, Plaintiff requests judgment be entered in his favor and against

Defendants, individually, jointly and severally, in an amount including statutory penalties, actual

and compensatory damages, treble and punitive damages, attorney's fees and costs, plus

equitable relief in the form of specific performance requiring the return of the or a like

comparable vehicle consistent with the terms of financing contained within the RISC or

comparable.

PROCHNIAK WEISBERG, P.C.

/s/ Matthew B. Weisberg
Matthew B. Weisberg, Esquire
Attorneys for Plaintiff

# EXHIBIT "B"

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Pamela Henderson | : | |
| 504 South Lansdowne Avenue, Apt. A7 | : | |
| Yeadon, PA 19050 | : | |
| | : | |
| Plaintiff, | : | DOCKET NO.: 09-4866 |
| v. | : | |
| | : | |
| Delaware County Park Police Department | : | |
| 201 W. Front Street | : | |
| Media, PA 19063 | : | |
| | : | |
| and | : | |
| | : | |
| Delaware County | : | |
| 201 W. Front Street | : | |
| Media, PA 19063 | : | |
| | : | |
| and | : | |
| | : | |
| John Does 1-10 | : | JURY TRIAL OF TWELVE (12) |
| | : | JURORS DEMANDED |
| Defendants. | : | |

## FIRST AMENDED CIVIL ACTION COMPLAINT

### I. Jurisdiction

1.      Plaintiff brings this case under federal, state, and constitutional laws and amendments,

respectively.

2.      Plaintiff seeks actual, statutory and punitive damages together with attorney's fees and

costs, and injunctive relief.

3.      Jurisdiction of this matter is conferred upon this Court by 28 U.S.C. §1331; supplemental

jurisdiction over Plaintiff's state law claims granted by 28 U.S.C. §1367.

4.      Venue lies in this judicial district in that the events that gave rise to this claim occurred

here, and one of the Defendants do business here.

**II. Parties**

5.      Plaintiff, Pamela Henderson, is a citizen of the Commonwealth of Pennsylvania residing at the above-captioned address.

6.      Defendant, Delaware County Park Police, is a governmental entity and agency of Defendant, Delaware County, maintaining its principal place of business at the above-captioned address.

7.      Defendant, Delaware County, is a municipality maintaining its principal place of business at the above-captioned address.

8.      Defendants, John Does 1-10, at all times material, was and/or is police others with the Delaware County Park Police Department, acting under color of state law, pursuant to either the official policy, custom or practice in both an individual and/or official capacity. This Defendant was acting in concert and conspiracy with other employees/agents of the Police Department, aiding and abetting same.

**IV.     Operative Facts**

9.      At that time and at all times material, Plaintiff was permanently disabled as a result of a work injury occurring on or about November 22, 2002.

10.     As a result of that work injury, Plaintiff had an electric neuro-stimulator surgically implanted in her spine for pain control and management.

11.     Additionally, Plaintiff's right hand is also permanently injured resulting in ulnar nerve transposition with a permanently clawed hand.

12.     Plaintiff's spinal implant is extremely sensitive to metal detectors of all kinds.

13.     As a result of the implant, Plaintiff cannot be subjected to any form of metal detection or risk a painful experience similar to being struck by lightening and risking that the implant get "fried" by the metal detector, exposing Plaintiff to the possibility of death or paralysis.

14.     As a result of the foregoing, Plaintiff carries a card in her wallet explaining the need for her to avoid metal detectors of all types and the like (i.e., requiring her to have a "pat down" by perhaps a female officer).

15.     On or about April 2, 2009, Plaintiff was in line at the Delaware County Courthouse to attend a hearing.

16.     On the above date, Defendant, Delaware County Park Police's employee, Defendant, John Doe 1, police officer, requested Plaintiff enter the courthouse through a metal detector.

17.     Upon Defendant, John Doe 1's request, Plaintiff informed said Defendant of the foregoing, producing and showing Defendant the above-discussed card.

18.     In response, Defendant, John Doe 1, directed Plaintiff to go around the metal detector advising Defendant, John Doe 2, another police officer with the Delaware County Park Police Department, likewise.

19.     In going around the metal detector per initial police officer's instruction, second police officer, John Doe 2, approached Plaintiff with a wand also meant for metal detection despite John Doe 1 advising John Doe 2 to the contrary.

20.     At all times material, John Doe 2 was within hearing distance of Plaintiff and John Doe 1, presumably having heard Plaintiff's instructions regarding her inability to be exposed to metal detection.

21.     To block John Doe 2's attempt to wand, Plaintiff put her hands up.

22.     In response, John Doe 2 advised Plaintiff that he would not be wanding Plaintiff near her heart.

23.     John Doe 2 again attempted to wand Plaintiff to which Plaintiff put her hands up again explaining that the wand could not be used at any part of her body without the risk of catastrophic consequences.

24.     In response, John Doe 2, for the third time, attempted to again wand Plaintiff.

25.     In response, and now fearing for her safety, Plaintiff pushed John Doe 2's wand away.

26.     John Doe 2 started screaming at Plaintiff, joined by John Doe 1, berating Plaintiff for refusing the wand.

27.     Then, John Doe 2 grabbed Plaintiff's right arm, which at all times is encapsulated by a brace and held together by staples due to her injury which, among others, includes reflex sympathy disorder, making her arm particularly susceptible to injury.

28.     Due to her condition, Plaintiff was severely injured as a result of John Doe 2 grabbing her arm.

29.     John Doe 1 and John Doe 2 then screamed repeatedly at Plaintiff to "get out of the courthouse."

30.     Thereafter untangling herself from Defendant's hold, Plaintiff left the courthouse.

31.     While outside, a sheriff with the Delaware County Sheriff's Office who had recognized Plaintiff brought Plaintiff back inside the courthouse towards a female sheriff.

32.     As initially requested by Plaintiff of Defendants-officers, the female police officer patted Plaintiff down allowing Plaintiff entry into the courthouse for her hearing.

33.     The female sheriff advised Plaintiff to file a Complaint against Defendants therein stating that Defendants were wrong.

34.    Later, Plaintiff filed that Complaint then discovering an employee of the Sheriff's department having the same medical device implanted.

35.    That employee advised Plaintiff that Sheriff's employee need not participate in metal detection of any kind because of her known susceptibility to injury resulting therefrom.

36.    As a result of the subject incident, Plaintiff reported her assault and battery to the Delaware County District Attorney's Office (prosecutor) and was ultimately advised that the matter will be handled internally without charges being filed.

**IV.    Causes of Action**

**COUNT I**
**CIVIL RIGHTS VIOLATIONS**
*Plaintiff v. All Defendants*

37.    Plaintiff incorporates paragraphs 1-36 as if same were fully set forth at length herein.

38.    As a direct and proximate result of Defendants' conduct, committed under color of state law, Plaintiff was deprived of the right to be free of excessive force, granted accommodation for her disability, interference with her right to access to the courts, and her right to due process of law and equal protection. As a result, Plaintiff suffered and continues to suffer harm, in violation of her rights under the laws and Constitution of the United States of America, in particular the Fourth and Fourteenth Amendments thereto, and Title 42 U.S.C. §1983, et seq., as well as their corollaries under the statutes of the Commonwealth of Pennsylvania.

39.    The actions described herein of Defendants were so malicious, intentional, and displayed with a reckless indifference to the rights, safety and well being of the Plaintiff, that imposition of punitive damages are warranted.

**COUNT II**
**CIVIL RIGHTS VIOLATION-MONELL**
*Plaintiff v. County, and Police Department*

40.     Paragraphs above are incorporated by reference as if fully set forth at length herein and below.

41.     Prior to the events described herein, Defendants, County and Police Department, developed and maintained policies, practices and customs exhibiting deliberate indifference to the Constitutional right of persons within the geographic and jurisdictional limits of the Commonwealth of Pennsylvania, which caused violations of Plaintiff's constitutional and other rights.

42.     Specifically, Defendants failed to adequately and properly supervise and train in various aspects of law enforcement, procedure and substance, including, but not limited to, the use of force, excessive force, reasonable accommodations inference with her right to access the courts, equal protection, and due process of law, and the laws of the United States, Commonwealth of Pennsylvania, and otherwise.

43.     The actions and conduct of Defendants was caused by the failure of the County and Police Department, with deliberate indifference, to properly train, control or supervise these police officers and/or detectives with respect to their investigative power in accordance with the United States and Pennsylvania Constitutions.

44.     The above described acts or omissions by Defendants demonstrated a deliberate indifference to the rights of those within Pennsylvania, such as Plaintiff, and were the cause of the violations of Plaintiff's rights as set forth herein.

**COUNT III**
**ADA**
*Plaintiff v. all Defendants*

45.     Plaintiff incorporates paragraphs 1-44 as if same were fully set forth at length herein.

46.     The actions of Defendants, through its agents, servants and employees, in subjecting Plaintiff to discrimination force, and interference with her right to access the courts because of her actual and/or perceived disabilities, constituted a violation of the ADA.

### COUNT IV
### PUNITIVE DAMAGES
*Plaintiff v. All Defendant's*

47.     Plaintiff incorporate paragraphs 1-46 as if same were fully set forth at length herein.

48.     The actions and misconduct set forth above of Defendants was extreme and outrageous and done intentionally and/or recklessly and/or maliciously by Defendants against Plaintiff.

49.     Said actions and misconduct were done with bad motives and in wanton, willful and reckless disregard for the rights of Plaintiff.

50.     Plaintiff herewith avers that Punitive Damages are warranted by the aforesaid conduct and actions and as a result of the aforementioned conduct, which is herewith incorporated by reference.

### COUNT V
### ASSAULT AND BATTERY
*Plaintiff v. all Defendants*

51.     Plaintiff incorporates by reference paragraphs 1-50 above as if the same were fully set forth at length herein.

52.     At the time of the aforementioned incident, the negligence, carelessness and recklessness of Defendants, consisted, but was not limited to the following:

      a.     Grabbing and/or otherwise harming Plaintiff, Pamela Henderson;

      b.     Threatening Plaintiff with the metal detector even after knowing of Plaintiff's disability;

      c.     Failure to comply with the laws, codes, ordinances and regulations of the controlling governments; and

      d.     Otherwise negligent, careless and reckless conduct as may be identified during discovery and/or at trial.

## V.     Prayer for Relief

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory

damages in an amount in excess of $75,000.00, plus punitive damages (in excess of

$250,000.00) against Defendants individually, jointly and/or severally, attorney's fees and costs,

statutory, injunctive and such other relief and costs this Honorable Court deems necessary and

just.


WEISBERG LAW, P.C.


/s/ Matthew B. Weisberg
MATTHEW B. WEISBERG
Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| PAMELA HENDERSON, | : | Civil Action |
| | : | |
| Plaintiff, | : | No. 09-CV-4866 |
| | : | |
| v. | : | |
| | : | |
| DELAWARE COUNTY PARK POLICE and | : | Jury Trial Demanded |
| DELAWARE COUNTY, et al., | : | |
| | : | |
| Defendants. | : | |

---

**DEFENDANTS', DELAWARE COUNTY PARK POLICE
AND DELAWARE COUNTY, STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Delaware County Park Police and Delaware County, by and through their attorneys, HOLSTEN & ASSOCIATES, hereby file this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment, as follows:

1. Plaintiff Pamela Henderson alleges that she is "permanently disabled as a result of a work injury occurring on or about November 22, 2002… As a result of that work injury, Plaintiff had an electro neuro stimulator surgically implanted in her spine for pain control and management." Amended Complaint at ¶ 9-10.

2. On April 2, 2009, Henderson was coming to the Delaware County Courthouse to attend a hearing. Amended Complaint at ℙ 15.

3. She got in line for the metal detector. Deposition Transcript of Pamela Way (formerly known as Pamela Henderson) at 37-38. A true and correct copy of the transcript is attached as Exhibit 1.

4. There were three Delaware County Park Police officers on duty in the lobby that morning, Officer Sean Dougherty, Officer Chris Cahall and Officer John Cooper. See Statements attached at Exhibit 3.

5. A Park Police officer, later identified as Officer Dougherty, asked her to go through the metal detector. Complaint at ¶ 16.

6. Henderson produced a card that read as follows: "I HAVE AN IMPLANTED MEDICAL DEVICE THAT MAY SET OFF YOUR AIRPORT/SECURTY SYSTEMS." A true and correct copy of the card is attached as Exhibit A to Henderson's deposition transcript.

7. Henderson produced the card to Officer Dougherty and he directed her to go around the metal detector to a second officer, later identified as Officer Chris Cahall, who was standing behind the metal detector, with a wand. Way Deposition at 39. See Statements attached at Exhibit 3.

8. The Park Police policy was that persons who could not go through the metal detector for some medical reason would be wanded. Deposition Transcript of Officer Cahall at 11. A true and correct copy of this deposition is attached as Exhibit 2

9. Officer Cahall approached Henderson with the wand and pointed it towards her chest area. Way Deposition at 40.

10. Henderson put her hands up to Officer Cahall and yelled, "I cannot be wanded!" Cahall deposition at 9. See Statements attached at Exhibit 3.

11. Henderson pointed to her upper body area. Cahall Deposition at 14. See statements attached at Exhibit 3.

2

12.   Officer Cahall never saw Henderson's card nor did Henderson ever show it to him.  Cahall Deposition at 8.  See statements attached at Exhibit 3.

13.   Officer Cahall told Henderson that he would only wand her around the waist and lower body area.  Cahall Deposition at 9.   See Statements attached at Exhibit 3.

14.   Henderson yelled again, "I cannot be wanded!"   Cahall Deposition at 9.

15.   Henderson testified she told Officer Cahall, "You can't use that on me, I have an implanted device."  Way Deposition at 42.

16.   Officer Cahall told Henderson he would do a pat-down search.   Cahall Deposition at 10-11.   See statements attached at Exhibit 3.

17.   As Officer Cahall attempted to do a pat-down search, Henderson lifted her arm to push Officer Cahall's arm aside.   Cahall Deposition at 10-11.   Way Deposition at 41.  See statements attached at Exhibit 3.

18.   Henderson testified that Officer Cahall grabbed her arm around in the elbow area, giving her a bruise. Complaint at ℙ 27.

19.   Henderson testified that when Officer Cahall grabbed her arm, she said, "Ouch, that hurts."  Way Deposition at 42.

20.   Henderson refused to be wanded or to have a pat-down search.   Cahall Deposition at 11.   See statements attached at Exhibit 3.

3

21.    Officer Cahall told Henderson that if she would not go through the metal detector, be wanded, or be patted down, she had to leave the courthouse.  Cahall Deposition at 15.

22.    One of the other officers in the lobby also told Henderson she had to leave the courthouse if she would not be searched.  Way Deposition at 43.  See statements attached at Exhibit 3.

23.    Henderson alleges she was "severely injured" as a result of the officer "grabbing her arm."  Complaint at ¶ 28.

24.    Henderson complained about the incident to the Delaware County District Attorney's office.  Way Deposition at 57.

25.    After Henderson lodged her complaint, the Park Police and ultimately the D.A.'s office looked into the incident.  See statements attached at Exhibit 3.

26.    The investigation included interviews with Henderson and all 3 officers on duty in the lobby.  True and correct copies of written statements produced by the D.A.'s Office investigation are attached as Exhibit 3.

27.    No charges were filed.  Way Deposition at 59.

4

28. Henderson re-entered the Courthouse later that morning after agreeing to a pat-down search by a female deputy sheriff. Way Deposition at 45.

Respectfully submitted,

**HOLSTEN & ASSOCIATES**

By: **/s/ M.A. RAITH, MR6959**
   **MARK ALAN RAITH, ESQUIRE**
   Holsten & Associates
   1 S. Olive Street
   Media, PA 19063
   (610) 566-8800

   Attorney for Defendants
   Delaware County Park Police
   and Delaware County

Dated: September 17, 2010

5

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PAMELA HENDERSON, | : | Civil Action |
| | : | |
| Plaintiff, | : | No. 09-CV-4866 |
| | : | |
| v. | : | |
| | : | |
| DELAWARE COUNTY PARK POLICE and | : | Jury Trial Demanded |
| DELAWARE COUNTY, et al., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS', DELAWARE COUNTY PARK POLICE
AND DELAWARE COUNTY, MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Delaware County Park Police and Delaware County, by and through their attorneys, HOLSTEN & ASSOCIATES, hereby file this Memorandum of Law in support of their Motion for Summary Judgment, as follows:

## I.  INTRODUCTION

This Section 1983 "excessive force" case arises out of an incident in the lobby of the Delaware County Courthouse on April 2, 2009 in which Plaintiff Pamela Henderson, now known as Pamela Way, alleges she was assaulted by a Delaware County Park Police officer at a metal detector.

Henderson claims that because of an implanted medical device, she is permanently exempted from going through metal detectors of any kind because if she does there will be "catastrophic consequences:" "similar to being struck by lightning and risking that the implant will be "fried" by the metal detector, exposing Plaintiff to the possibility of death or paralysis." Amended Complaint at ₽ 13.  With

discovery completed there is no medical evidence that any such thing would or could happen, indeed no evidence of any kind on this point besides Henderson's own testimony.

Henderson further alleges that she presented a Park Police officer with a card "explaining the need for her to avoid metal detectors of all types and the like (i.e. requiring her to have pat—down by a female officer"). Amended Complaint at ℙ 14. The card Henderson produced on the day in question actually says no such thing. The card merely explains that she had an implanted medical device that "may set off" a metal detector.

In any event, there is no dispute that no one forced Henderson to go through the metal detector. She was directed to a Park Police officer who attempted to "wand" her with a hand held metal detector. Henderson loudly objected to being wanded. When the officer said he would do a pat down search, she loudly objected to that as well. At no time did she ever show the officer her card or ask for a female officer to do the pat down. As all accounts agree, all she did was yell and try to push the officer away. She was ordered out of the courthouse, but later returned and was re—admitted after finally agreeing to a pat down search by a female deputy sheriff.

Even if this court fully credits Henderson's version of what happened this morning, the only "force" used was that a Park Police Officer "grabbed" her arm and caused a bruise. This is hardly "force" at all, but even if it is considered force it is only "de minimis" force and therefore insufficient for a Section 1983 excessive force claim.

2

Finally, summary judgment should be granted because the officers who were involved in the incident, whose identities have been known to Plaintiff's counsel for almost 8 months, have never been named as defendants in this case and the time for a valid amendment has long since expired.

## II.  FACTUAL BACKGROUND

### A.  THE AMENDED COMPLAINT

Plaintiff Pamela Henderson alleges that she is "permanently disabled as a result of a work injury occurring on or about November 22, 2002… As a result of that work injury, Plaintiff had an electro neuro stimulator surgically implanted in her spine for pain control and management."  Amended Complaint at ¶ 9–10.  Henderson claims a prior injury to her right hand "resulting in ulnar nerve transposition with a permanently clawed hand."  Amended Complaint at ¶ 11.  She alleges her "spinal implant" is "extremely sensitive to metal detectors of all kinds."  Amended Complaint at ¶ 12.  As a result, according to the Amended Complaint,  "Plaintiff cannot be subjected to any form of metal detection or risk a painful experience similar to being struck like lightning and risking that the implant gets 'fried' by the metal detector, exposing Plaintiff to the possibility of death or paralysis."  Amended Complaint at ¶ 13.

On April 2, 2009, Henderson was coming to the Delaware County Courthouse to attend a hearing.  She got in line for the metal detector.  One of the Delaware County Park Police officers who man the detector asked her to go through the metal detector.  Amended Complaint at ¶ 16.  Henderson produced a card she said explained the

3

need for her "to avoid metal detectors of all types and the like (i.e., requiring her to have a 'pat down' by perhaps a female officer." Amended Complaint at ¶ 14. Henderson alleges she produced the card and the park policeman told her to go around the metal detector and told a second officer she was doing so. Amended Complaint at ¶ 17–18. The second officer approached Henderson with a wand. Amended Complaint at ¶19. Henderson alleges she overheard the first officer telling the second officer of her "inability to be exposed to metal detection." Amended Complaint at ¶ 20.

Nevertheless, despite this "instruction," the second officer "approached Plaintiff with a wand." Amended Complaint at ¶ 19. Henderson put her hands up to "block John Doe 2's attempt to wand." Amended Complaint at ¶ 21. The second officer advised her "he would not be wanding her near her heart." Amended Complaint at ¶ 22. Henderson put her hands up again, "explaining that the wand could not be used at any part of her body with the risk of catastrophic consequences." Amended Complaint at ¶ 23.The second officer "for the third time," tried to wand Henderson again. Amended Complaint at ¶24. He also "started screaming" as did the first officer, "berating" Henderson for "refusing the wand." Amended Complaint at ¶ 26. The Amended Complaint alleges that the second officer "grabbed Plaintiff's right arm, which is at all times encapsulated by a brace and held together by staples due to her injury which, among others, includes reflex sympathy disorder, making her arm particularly susceptible to injury." Amended Complaint at ¶27.

4

Henderson alleges she was "severely injured" as a result of the second officer "grabbing her arm." Amended Complaint at ¶ 28. Both officers then "screamed repeatedly" at her to "get out of the courthouse." Amended Complaint at ¶ 29. After "untangling herself" from the first officer's "hold," she left the courthouse where she ran into a sheriff's deputy who brought her back in. Amended Complaint at ¶ 32. There a female officer patted her down and allowed her to enter to the courthouse. Amended Complaint at ¶32. Henderson reported her "assault and battery" to the D.A.'s office, which "ultimately advised that the matter would be handled internally without charges being filed." Amended Complaint at ¶ 36.

The Amended Complaint includes 2 claims under Section 1983, one for excessive force and another based on Monell liability, a claim under the Americans With Disabilities act, a punitive damages claim and a state law claim for assault and battery. Damages are alleged to be excess of $250,000.

## B.  **THE INVESTIGATION**

After Henderson lodged her complaint, the Park Police and ultimately the D.A.'s office looked into the incident. This investigation included interviews with Henderson and all 3 officers on duty in the lobby that morning. These Statements are attached as Exhibit 3. Also produced was a copy of the card referred to, that Henderson claims exempts her from all metal detection. The card, a copy of which is attached as Exhibit B to Plaintiff's deposition transcript actually says:

5

"I HAVE AN IMPLANTED MEDICAL DEVICE THAT MAY SET OFF YOUR AIRPORT/SECURTY SYSTEMS."

## 1. STATEMENT OF OFFICER DOUGHERTY

Officer Sean Dougherty was working at the metal detector in the main lobby of the Courthouse when Henderson came in. He recalled her showing him the card. Officer Dougherty asked her to step around the machine towards Officer Christopher Cahall so she could be wanded. Next, Officer Dougherty "heard [a] commotion behind me." He heard Officer Cahall tell Henderson not to push his arm away. Henderson began to scream to Officer Cahall that she could not search her. A male who was with Henderson put his arm between Henderson and Officer Cahall who then told her that if she did get wanded she could leave the courthouse. Henderson "continued to cause a scene and would not allow Officer Cahall to search her." She was told to leave the courthouse, which she did.

## 2. STATEMENT OF OFFICER CAHALL

Officer Cahall stated that Henderson came in at approximately 8 a.m. on April 2nd. She told Officer Dougherty she could not go through the metal detector. Officer Dougherty allowed her to go around the metal detector and "have myself wand her down with our hand held wand." Officer Cahall stated that he knew nothing about Henderson's card and never saw it. When Officer Cahall tried to wand Henderson "she stated loudly that she could not be wanded." She pointed to her heart and left shoulder area. Officer Cahall told her that he would only wand her around the waist and lower body area. She "yelled louder and this time stated she can not be wanded."

6

Officer Cahall placed the wand between his legs and attempted to search her by hand. He said he stuck his hand between her arm and body to pull her arm away from her body, but at no time did he actually grab her arm. Henderson then grabbed Officer Cahall's arm and pushed it away and again stated that she would not be wanded. Officer Cahall stated that the wand was between his legs. Henderson again "yelled" that she would not be wanded. Officer Cahall told her she had to be searched and she replied that she would not be searched. Officer Cahall told her that she had to leave the building. She turned to exit but stopped at the front doors. Officer Cahall told her again to exit the building. She said she "had to take paper work upstairs." Officer Cahall told her again to exit the building and she exited.

She returned approximately 3 hours later. "I was stationed in the Sweeney building when the same female came in and saw this officer. She turned around to exit and said I'm not going in there there's that ignorant officer again." She exited again.

## 3. STATEMENT OF OFFICER COOPER

Officer William J. Cooper also gave a statement. Cooper said he was working at another metal detector in the lobby when Henderson approached on April 2nd. He heard a female raising her voice, saying, "you can't search me, you can't use that on me." He turned around and saw Office Cahall had the metal detection wand between his legs and was facing the female. The female continued to yell, "You can't use that on me and get your hands off me." Officer Cahall was not touching her. Henderson went on to yell, "You can't search me."

7

Cooper attempted to step between Officer Cahall and the female to advise her that all persons entering the courthouse were subject to search. She continued to yell, at which point Officer Cooper raised his voice to be heard and told her that if she would not searched she would have to leave the courthouse. The female and a male companion would not leave until Officer Cahill told her several times, at which point they finally did. Her friend came through a few minutes later "without incident."

## III.  **LEGAL ARGUMENT**

### A.  **STANDARD FOR MOTION FOR SUMMARY JUDGMENT**

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548 (1986). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Woodside v. School District of Philadelphia, 248 F.3d 129, 130 (3d Cir. 2001) quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 106 S.Ct 2505 (1986). See also Doe v. Abington Friends School, 480 F.3d 252, 256 (3d Cir. 2007).

8

**B.  DELAWARE COUNTY PARK POLICE IS NOT A "PERSON" FOR THE PURPOSES OF SECTION 1983**

It has been established law for decades that police departments operated by municipalities are not "persons" for the purposes of a Section 1983 claim. See, e.g., Terrell v. City of Harrisburg Police Department, 549 F. Supp 2d 671, 686 (M.D. Pa. 2008). See also Martin v. Red Lion Police Department, 146 Fed. Appx. 558, 562 n. 3 (3d Cir. 2005).

Accordingly, the Delaware County Park Police Department must be dismissed as a defendant in this case.

**C.  THERE IS NO EVIDENCE TO SUPPORT A MONELL CLAIM**

Furthermore, a municipality can only be liable if the plaintiff can identify a "policy or custom" that caused the plaintiff's injury. Monell v. Dept of Social Services, 436 U.S. 397, 403, 117 S.Ct. 1382 (1978). Liability may not be founded exclusively on the actions of a municipality's employees via respondeat superior. Colburn v. Upper Darby Township, 946 F.2d 1017, 1027 (E.D. Pa. 1991). Municipal liability also requires a direct causal link between the municipal custom or practice and the alleged constitutional violation. Brown v. Muhlenberg Township, 269 F.3d 205, 214 (3d Cir. 2007).

There is no evidence that any policy or custom initiated by Delaware County caused Henderson' alleged injury. A plaintiff must establish a policy of custom of the municipality caused the constitutional violation. Watson v. Abington Township, 478 F.3d 144, 155 (3d Cir. 2007). A policy is established when it is shown that a "decisionmaker possessing final authority to establish a municipal policy with respect to the action" has issued "an official

9

proclamation, policy or edict." Id. A custom is established when in the absence of a formal statement or policy, it can be shown that a given course of conduct… is so well settled and permanent as virtually to constitute law. Custom is usually established by knowledge and acquiescence in that practice. Beck v. City of Pittsburgh, 89 F.3d 966, 972 (3d Cir. 1996).

Plaintiff made no effort to even develop any evidence that a policy or custom was at issue here. Therefore Delaware County is entitled to summary judgment.

**D.   ANY USE OF FORCE WAS DE MINIIMIS**

To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a "seizure" occurred and that it was unreasonable. Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004) quoting Smith v. Marasco, 318 F.3d 497, 515 (3d Cir. 2003). The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances "the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying merit or motivations." Kopec, 361 F.3d at 776. quoting Graham v. Connor, 490 U.S. 386, 397 109 S.Ct. 1865 (1 989).

What courts have referred to as the "calculus of reasonableness" must allow for the fact that law enforcement officers are often forced to make split-second judgments in circumstances that are "tense, uncertain, and rapidly evolving" about the amount of force that is necessary in a particular situation. Graham, 490 U.S. at 396-397. Therefore, the reasonableness of a particular use of force must be

10

judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.

There is no doubt that as a general proposition, the issue of reasonableness is usually a question of fact reserved for a jury. Summary judgment is appropriate only is the court resolves all factual disputes in favor of a plaintiff and concludes that the use of force was objectively reasonable under the circumstances. Brice v City of York, 528 F.Supp.2d 504, 513 (M.D. Pa. 2007), quoting Gravely v. Sperenza, 219 Fed Appx. 213, 215 (3d Cir 2007).

However, the law is clear that the application of de minimis force, without more, will not support a claim for excessive force. The force used must rise above a de minimis level for a constitutional claim to arise. Ingraham v. Wright, 430 U.S. 651, 674 (1977). Over the past decade, many courts in this district have granted summary judgment after concluding the force used was de minimis. See e.g., Nardini v. Hackett, 2001 WL 1175130 (E.D. Pa. Sept 19, 2001) (grabbing plaintiff's arm while trying to arrest her and removing her from her car was de minimis force); Garcia v. County of Bucks, 155 F. Supp. 2d 259, 265 (E.D. Pa. 2001) (grabbing plaintiff's coat and arms while trying to arrest him was "minimal and routine" and not even de minimis force); Foster v. David, 2006 WL 2371976 (E.D. Pa. Aug 11 2006) (removing plaintiff from a doorway during a search was de minimis force), Ankele v. Hambrick, 2003 WL 21223821 (E.D. Pa. May 7, 2003), affirmed 136 Fed. Appx. 557 (3d Cir. 2005) (pushing plaintiff onto the hood of his car was de minimis force); Bensinger v. Mullen, 2000 WL 1100781 (E.D. Pa. August 4, 2000) (shoving plaintiff to the ground

11

during arrest so that he incurred a "brush burn" bruise was de minimis force).

This case is a perfect illustration of the "tense, uncertain and rapidly evolving" situation the Supreme Court described in Graham. In this case there is no factual dispute that the officer never saw Henderson's card and was never told about it, by Henderson or anyone else. As he testified, he "never had a chance" to be told anything or ask about anything. Cahall Deposition at 14. All he knew was that he was confronted with a woman who began yelling at him as soon as she saw the wand he was pointing in her direction, and she kept yelling while she trying to fend off his attempt to give her a pat-down search as well.

Officer Cahall's testimony is that he never "grabbed" Henderson. None of the other officers even saw him touch Henderson. However, even if Henderson's version of the incident is given full credit, the only use of force is the following:

"… he then grabs me in my elbow area…"

Way Deposition at 42.

Henderson testified that when Officer Cahall grabbed her arm, she said, "Ouch, that hurts." Way Deposition at 42. Henderson claims that this caused her to develop a bruise on her arm. A photograph of what is purported to be a bruise caused by Officer Cahall is attached as Exhibit B to her deposition transcript. Her Amended Complaint alleges the incident caused her to be "severely injured." Amended Complaint at ℙ 28.

12

Once again, even if the court assumes that Officer Cahall "grabbed" Henderson's arm, and even if the court assumes the bruise depicted in the photograph was actually caused by the incident, and not by Henderson's pre—existing medical condition, a condition Henderson described as "reflex sympathetic dystrophy," the entire incident is best described by what Henderson says her reaction was when it happened: "Ouch, that hurts."

What happened on that morning in the Courthouse lobby was clearly "de minimis" force, at best. With discovery at an end there is absolutely no evidence that the incident caused Henderson anything worse than the bruise depicted in the photo.

Accordingly, there can be no valid "excessive force" claim in this case.

## E.    **THE OFFICERS ARE PROTECTED BY QUALIFIED IMMUNITY**

The Supreme Court of the United States held in Pearson v. Callahan, __ U.S. __, 129 S. Ct. 808 (2009) that the 2—step test to analyze claims of qualified immunity, (1) was a constitutional right violated and (2) if so, was that right "clearly established," is still valid but that the courts may proceed directly to the second step without deciding the first step.   There is no ambiguity about the intent of the Pearson ruling: to make the qualified immunity defense more readily available to defendants, earlier in a case, in order to avoid "what may seem to be an essentially academic exercise."   129 S.Ct. at 818.

This is a case in which qualified immunity clearly applies. Officers Dougherty and Cooper had no involvement whatsoever in the

13

incident other than to point Henderson towards Officer Cahall and/or to order her to leave the courthouse when she refused to go through the metal detector, be wanded, or be patted down. Officer Cahall, even if he grabbed Henderson's arm while she was resisting a pat—down search, could not possibly have known that doing so was violating her constitutional rights.

Accordingly, all three officers are protected by qualified immunity.

## F. **PLAINTIFF HAS NEVER ATTEMPTED TO AMEND THE COMPLAINT TO INCLUDE THE OFFICERS INVOLVED, DESPITE KNOWING WHO THEY WERE, WITHIN 120 DAYS, AS REQUIRED BY RULE 4**

It is important to note that the analysis provided above in connection with the Amended Complaint's claim of excessive force in Count I is to a large extent purely theoretical because the Amended Complaint only named "john does" as defendants. None of the officers involved, whose identities have been no mystery since the incident itself, over 17 months ago, have ever been named as defendants in this lawsuit.

Rule 4 of the Federal Rules of Civil procedure requires all defendants to be served within 120 days of the issuance of the summons. The original complaint filed by Plaintiff concerned a consumer fraud case that had no conceivable application against the Delaware County Park Police or Delaware County. The Amended Complaint, which included Henderson's excessive fraud allegations, was filed on October 29, 2009 and served on the Delaware County Park Police and Delaware County on November 13, 2009. The Amended Complaint listed "John Does 1-10" as defendants.

14

Defendants answered the Amended Complaint on December 7, 2009. On January 28, 2010, Defendants complied with their duty of self-executing disclosure and forwarded counsel for Plaintiff all the documents in their possession relating to the case, which included the investigation performed by the Delaware County D.A's office and specifically included statements from the 3 officers on duty in the lobby on the date of the incident, Officers Cahall, Dougherty, and Cooper. On March 29, 2010, counsel for Plaintiff took the depositions of Officers Cahall, Dougherty and Cooper.

Despite being aware of the identity of the officers no later than the end of January, 2010, Plaintiff did not and never has amended the complaint nor made any effort to amend the complaint or serve the officers involved. The 120-day deadline for doing so has long since expired and any potential claims against them in this lawsuit must be dismissed.

Rule 15 regulates the amendment of pleadings. Under Rule 15 (a), an amendment as a matter of course may only be made within 21 days of service of the pleadings. This "matter of course" amendment was already done before the summons was even served on Defendants. Afterwards, an amendment may only be made "with the opposing party's written consent or by the court's leave. The court should freely grant leave if justice so requires."

In this case, justice requires that no amendment be permitted. As set forth above, the excessive force claims made by Plaintiff have no merit. Furthermore, despite knowing the identity of the officers involved for over 8 months, Plaintiff has made no effort to amend the

15

complaint to properly name them as defendants in this case. While Rule 15 permits an amendment that "relates back to the date of the original pleading," the "original pleading" in this case made no reference whatsoever to an excessive force claim. An amendment can only be permitted if and only if it is done "within the period provided by Rule 4(m) for serving the party to be brought in by amendment.

None of the requirements for a Rule 15 amendment are present. The original pleading did not notify anyone, even the original defendants, of the nature of the claim. The parties to be brought in presumably Officers Cahall, Dougherty and Cooper, were not named in a proposed amendment within 120 days of the issuance of the summons, which was on or before March 2, 2010. Accordingly, any possible claims against Officers Cahall, Dougherty and Cooper should be dismissed. See, e.g. E.H. v. School District of Philadelphia, 2009 WL 4911936 (E.D Pa. Dec. 21 2009)(court would not allow amendment after 120 day period had run).

The failure to amend the complaint is no empty procedural defect in this case. It carries with it very real prejudice for the officers involved. The officers' claims that they are protected by qualified immunity is one for which they have a right of immediate appeal if that claim is denied. Clearly, if Plaintiff decides to pass on amending the claim to include the officers as defendants, there is no way any valid immunity defense can be raised when the only defendants are "john does."

16

**G.**   **THERE IS NO EVIDENCE TO SUPPORT A CLAIM UNDR THE AMERICANS WITH DISABILITIES ACT**

The Amended Complaint also includes a claim under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.  Since the claim of excessive force in Count I is the primary basis for Plaintiff's ADA claim, in order to prevail on that claim Plaintiff must prove that any discrimination she faced was on account of her disability.  Chisolm v. McManimon, 275 F.3d 315, 324 n.9 (3d Cir. 2001).  See also Schultz v. Carlisle Police Department, ___ F. Supp. 2d ___, 2010 WL 1433124 (M.D. Pa. April 7, 2010).

Plaintiff has shown no evidence of any description to support the claim that the excessive force used against her was attributable to her alleged disability.  To the contrary, there is no evidence whatsoever that either Officer Cahall or any of the other officers had any idea that Henderson even had a disability, only that she refused to be wanded or to submit to a pat down search.

Finally, given Henderson's testimony that she left the Courthouse, returned, and re-entered by another entrance some time later after finally agreeing to a pat—down search by a female deputy sheriff, there can also be no conceivable merit to any allegation that she was "denied access to the court."

**H.**   **THERE IS NO EVIDENCE TO SUPPORT A CLAIM OF ASSAULT AND BATTERY**

The tort of battery requires that the defendant act with the intent to place the plaintiff in apprehension of imminent harmful or offensive bodily contact and that the plaintiff actually experienced such apprehension.  D'Errico v. DeFazio, 763 A.2d 424, 432 n. 2 (Pa. Super. 2000).  Battery requires proof that defendant acted with the

intent to cause harmful of offensive bodily contact with the person of the plaintiff and that such contact actually followed. Fulks ex rel. Daniel v. Gasper, 439 F. Supp. 2d 372, 379 (M.D. Pa. 2006). Montgomery v. Bazaz-Sehgal, 742 A.2d 1125, 1130 (Pa. Super. 1999). In order to prove assault, there must be evidence of "an intentional attempt to do an injury to a person of another." Cohen v. Lit Brothers, 166 Pa. Super. 206, 70 A.2d 419, 421 (1950).

Pennsylvania law is clear however that law enforcement officers are privileged to use a reasonable amount of force "in order to prevent interference with the exercise of his duty… The reasonableness of the force used determines whether the officer's conduct constitutes an assault." Renk v. City of Pittsburgh, 537 Pa. 68, 641 A.2d 289, 293 (1994).

There is no evidence that would support the state law claims of assault and battery in this case. Even if this court assumes the officer "grabbed" Henderson's arm, the evidence is clear that this was done only in furtherance of the exercise of his duty, which on the morning in question was to perform searches and provide security for the Delaware County Courthouse. Furthermore, the "reasonableness" of the force used is obvious: any contact, even if the court assumes there was contact, was de minimis.

## I.  COUNT IV'S CLAIM FOR PUNITIVE DAMAGES MUST BE DISMISSED

There can be no dispute that punitive damages are not recoverable against a municipality, nor could they possibly be collectible from john doe defendants. See City of Newport v. Fact Concerts, Inc., 453

18

U.S. 247, 260, 101 S.Ct. 2748, 2756 (1981).   Accordingly, Count IV's claim for punitive damages must be dismissed, with prejudice.

## IV.   CONCLUSION

Defendants  Delaware  County  Park  Police  and  Delaware  County respectfully request that this Honorable Court grant their Motion for Summary Judgment.

Respectfully submitted,

**HOLSTEN & ASSOCIATES**

By:   **/s/ M.A. RAITH, MR6959**
**MARK ALAN RAITH, ESQUIRE**
Holsten & Associates
1 S. Olive Street
Media, PA 19063
(610) 566-8800

Attorney for Defendants
Delaware County Park Police
and Delaware County

Dated: September 17, 2010

19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PAMELA HENDERSON, | : | Civil Action |
| | : | |
| Plaintiff, | : | No. 09-CV-4866 |
| | : | |
| v. | : | |
| | : | |
| DELAWARE COUNTY PARK POLICE and | : | Jury Trial Demanded |
| DELAWARE COUNTY, et al., | : | |
| | : | |
| Defendants. | : | |

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that Defendants' Motion for Summary Judgment, Statement of Material Facts, and Memorandum of Law in Support of Summary Judgment were filed electronically on September 17, 2010, and are available for viewing and downloading from the ECF system. The Exhibits in Support of the Motion will be forwarded to the Clerk of Court by U.S. Mail. Service on counsel for Plaintiff has also been made via First Class United States Mail, postage prepaid, U.S. Mail, addressed as follows:

Matthew B. Weisberg, Esquire
WEISBERG LAW, P.C.
7 S. Morton Avenue
Morton, PA 19070

This statement is made subject to the penalties of 18 U.S.C. § 1621, relating to perjury.

Respectfully submitted,

**HOLSTEN & ASSOCIATES**

By:     _**/s/ M.A. RAITH, MR6959**_
        **MARK ALAN RAITH, ESQUIRE**